**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Elizabeth Hatch, et al.,

Plaintiffs,

v.

Civil No. 01-1906 (RHK/AJB)
**MEMORANDUM OPINION AND ORDER**

Ken Grosinger, et al.,

Defendants.

---

Robert M. McClay, McClay Alton, P.L.L.P., Saint Paul, Minnesota, for Plaintiffs.

C. David Dietz, Ramsey County Attorney's Office, Saint Paul, Minnesota, for Defendants.

---

## Introduction

This matter comes before the Court on Defendants' Motion for Summary Judgment. Elizabeth Hatch, Charles Hatch and their children Robby, Kelley, and Katie Hatch (collectively, "the Hatches"), have sued Deputy Sheriff Ken Grosinger and Sheriff Bob Fletcher, in their individual and official capacities, the County of Ramsey, and John Does 1-15 (collectively, "Defendants") over the shooting death of the Hatches' dog, Gwennie. Defendants have moved for summary judgment on the grounds that they have



MAR 0 3 2003
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD MAR 0 3 2003
DEPUTY CLERK

qualified and official immunity from suit. For the reasons set forth below, the Court will grant Defendants' motion.

## Background

On the morning of Saturday, June 23, 2001, six Ramsey County Deputies arrived at 568 Sherburne Ave., in Saint Paul, Minnesota, to serve a felony arrest warrant. (Defs.' Mem. Supp. Sum. J. at 1.) The deputies were attempting to locate Kenneth James Jorgenson, who was wanted for offering forged checks. (Id.) The Sheriff's Department had twelve past addresses for Jorgenson, and none since 1995. (Defs.' App. Ex. 3 (Personal Warrant Information for Kenneth James Jorgenson).) Kenneth James Jorgensen had not lived at 568 Sherburne since 1983. (McClay Aff. Ex. 28 (Jorgensen Aff.).) According to one of the deputies, "We couldn't find anything when [we] worked him up so this is – we are going up there to knock and see what we've got." (McClay Aff. Ex. 13 (Grosinger Dep.) at 9.) The deputies considered it unlikely that they would find Jorgenson at that address. (Id. at 30.)

### A. The Hatches' Dog

Currently residing at 568 Sherburne were Charles and Elizabeth Hatch, their children, Robby, Kelley, and Katie Hatch, and their dog, Gwennie, a 58-pound female black labrador retriever. Elizabeth Hatch described the dog as

> very gentle, she was—she was just a nice dog. She—I took her—I would take her with me to the school and the kids would, you know, play with her and meet her. She would lie down in the midst of a pile of kids and they'd all, you know—some of them if they were afraid, I could get her to lie down so that she was facing away

> from them so that they [could] kind of touch her tail. She was—she was—she was an awfully good dog . . . .

(McClay Aff. Ex. 3 (Elizabeth Hatch Dep.) at 55-56.) Ms. Hatch, a professional dog trainer who owned and operated Good Dog Training Services, used Gwennie during her training classes:

> [S]he was perfect with young puppies. She would play with them. Or she would lie down and let them crawl on her. I didn't have to worry about her getting irritated with puppies in a young puppy class. So she was ideal for me to bring into a class setting and have no worries at all for my clients' dogs. [S]tudents of mine . . . just told me wonderful things. . . . She was a great example.

(Id. at 108.)

Gwennie, however, had been known to behave aggressively toward strangers entering the Hatches' gated front yard. Myron Halley, for instance, the Hatches' regular mail carrier, had an encounter with the dog that the Sheriff's Department would later summarize in their report of the shooting incident:

> Halley described an incident this past winter where he shook the gate at 568 Sherburne. After getting no response, he opened the gate and delivered the mail. He said that he had turned and was heading back to the gate when he heard the side door open. He said that the dog came after him, and was about to bite him when he shoved a handful of mail at him. Halley said the dog bit the mail instead of "taking a chunk of my hand."

(Defs. App. Ex. 12 (Sheriff's Department Investigation Report) at 13.) After this incident, the post office suspended mail delivery at 568 Sherburne. (Id.) Postal service did not resume until the Hatches agreed not to let the dog out from the side door. (Id.)

Similarly, Wendy Zarse, the Hatches' relief letter carrier, told the Sheriff's Department that Gwennie would "go a little crazy" when she saw her. (Id. at 14.) Zarse said the dog would "jump on the fence and chase along the fence line as she walked by the yard. . . . barking and growling as it jumped." (Id.) Zarse refused to deliver mail when Gwennie was in the yard.

### B. The Deputies Enter the Yard

At 9:15 a.m. on June 23, 2001, Ramsey County Deputies Ken Grosinger, Matt Lassegard, and Ken Urbiha walked to the chain link front gate at 568 Sherburne. (Defs.' App. Ex. No. 6 (Lassegard Dep.) at 15.) At the same time, Deputies Bob Marascuilo and Kent Mueller began heading to the back of the house in case Jorgensen attempted to flee. (McClay Aff. Ex. 17 (June 27, 2001 Statement of Ken Urbiha) at 7.) Sergeant Marie Ballard, the leader of the team, was stationed in the van. (Defs.' App. Ex. 1 (Ballard Dep.) at 60-63.) While Ballard, Marascuilo, and Grosinger were experienced deputies, Mueller, Urbiha, and Lassegard were trainees.

Outside the front gate, Grosinger explained to Lassegard and Urbiha what to look for to determine the presence of a dog. Grosinger considered this important information because of his own family experience with dogs: "My father was a U.S. postal carrier for 30 years. He was bitten a couple times very severely so just growing up around that. I was – dogs are something to be aware of." (McClay Aff. Ex. 13 at 17.) The deputies saw no evidence of a dog at 568 Sherburne and proceeded through the gate.

### C. Mr. Hatch Describes the Incident

At the same time, Charles Hatch, his daughters, and Gwennie were exiting the rear of the house on the way to a veterinary appointment. As Mr. Hatch testified, "[T]he dog and the two girls, their noses, were to the door as I opened it, so all three exited the door at once. And I was directly behind." (McClay Aff. Ex. 4 (Charles Hatch Dep.) at 34.) As Mr. Hatch closed the back door, closed the screen door, walked down the rear steps, he heard Gwennie barking; within "one or two seconds," he heard shots. (Id. at 36.) The Hatches' neighbor from two doors down also "heard a dog bark, and then a split second later a number of shots." (McClay Aff. Ex. 6 (February 5, 2003 Statement of Maria Gonzalez).) As Mr. Hatch went around to the front, he saw the dog "heading back towards me in a wandering, lazy aimless manner, as though she were drunk . . . ." (McClay Aff. Ex. 4 at 36.) He also saw two deputies backing away from him. The deputies "gave me this expression of kind of disbelief and 'Oh, oh,' something went wrong." (Id. at 38.) While Mr. Hatch was able to get Gwennie to a veterinarian, she died a short time later.

### D. Deputies Describe the Incident

The Sheriff's Department investigated the shooting. As Deputy Grosinger described the incident:

> I go through the gate and approach . . . the porch area there . . . . I'm heading for the mailbox . . . , one of the standard things I'll do is, and there was mail in the mailbox that morning is I'll look in the mailbox . . . [to see] the names of who's living there. . . . [S]o I'm about to look at the mailbox . . . and all the sudden

> [Deputy] Matt Lassegard . . . yells dog, dog coming . . . . [A]lls I remember is that dog coming around the corner, it was kind of in—in a fishhook, its head is out but its body is slightly tipped to its left . . . its head is kind of down and I see its teeth and its coming. . . . I don't remember drawing, I remember saying stop, probably would have been better to say down boy or something but I'll tell you it went quick . . . .

(McClay Aff. Ex. 14 (June 28, 2001 Statement of Kenneth Grosinger) at 11.) Deputy Grosinger indicated that the dog was "three feet from me and coming" when he pulled the trigger. (Id.) He fired at least three shots and as many as five. For Grosinger, it was "the first time I ever shot . . . except for at the range . . . ." (Id. at 14.)

The other deputies' accounts of the incident parallel Grosinger's. According to the deputies, Gwennie approached as "a black blur, a black dog with its hackles up" (Defs.' App. Ex. 6 (Lassegard Dep.) at 24) and like a "black missile" (Defs.' App. Ex. 12 (Sheriff's Department Investigation Report)). As the Sheriff's investigation noted, "All three deputies describe a continuous high-speed approach by the dog, with the dog making [a] fishhook turn [toward Grosinger] at full speed. The dog never stopped until it was shot." (Id. at 7.)

**Standard of Decision**

A party is entitled to summary judgment if the evidence demonstrates that there is no genuine issue as to any material fact and that the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In viewing the evidence, the Court makes its inferences in the light most favorable to the nonmoving party. Enterprise Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996); see also Adkinson v. G.D. Searle & Co., 971 F.2d 132, 134 (8th Cir.

1992). The burden is on the moving party, Enterprise Bank, 92 F.3d at 747; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986), and summary judgment should be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986). In essence, the court performs a threshold inquiry to determine whether there is need for trial. Id.

## Analysis

Defendants have moved for summary judgment on three grounds. First, Defendants assert that Deputy Grosinger is entitled to qualified immunity on the Hatches' § 1983 claim. Second, Defendants argue the Hatches' "failure to train" claim fails because the Hatches have not demonstrated a constitutional violation. Finally, Defendants argue they are entitled to official immunity against the Hatches' state law claim.

### A. Qualified Immunity

On summary judgment, the Court asks two questions to determine whether qualified immunity is appropriate. The Court first inquires whether the facts, taken in the light most favorable to the party asserting the injury, demonstrate a constitutional injury. Saucier v. Katz, 533 U.S. 194, 200 (2001); Siegert v. Gilley, 500 U.S. 226, 232 (1991). If, after viewing the facts in a light most favorable to the nonmoving party, a constitutional injury is not established, the Court may end the inquiry there. Saucier, 533 U.S. at 200. If, however, the Court finds a constitutional violation, it must ask whether

the right was clearly established. Id. To determine whether a right is clearly established, the Court asks whether the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right. Anderson v. Creighton, 483 U.S. 635, 640 (1987). "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

### 1. Constitutional Injury

The Hatches have alleged that Officer Grosinger's shooting of their dog constitutes an unreasonable seizure in violation of the Fourth Amendment. The Fourth Amendment protects:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

A "seizure" of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." United States v. Jacobsen, 466 U.S. 109, 113 (1984). "The destruction of property is 'meaningful interference' constituting a seizure under the Fourth Amendment . . . ." Fuller v. Vines, 36 F.3d 65, 68 (9th Cir. 1994) ("Fuller I"). As Defendants concede, the shooting and killing of a dog constitutes "destruction" and therefore a seizure of that dog. (See Defs.' Mem. Supp. Summ. J. at 9);

see also Fuller v. Vines, 1997 WL 377162 (9th Cir. 1997) (unpublished opinion) ("Fuller II") (shooting of dog constitutes seizure); Newsome v. Erwin, 137 F. Supp. 2d 934 (S.D. Ohio 2000) (the killing of the lioness qualifies as a "seizure" under the Fourth Amendment); see also Lesher v. Reed, 12 F.3d 148, 150 (8th Cir. 1993) (taking of dog states claim for seizure).

The first half of the qualified immunity inquiry therefore turns on whether the seizure was unreasonable. "In the ordinary case, the [Supreme] Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." United States v. Place, 462 U.S. 696, 701 (1983). When the state claims a right to make a warrantless seizure, the Court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Place, 462 U.S. at 703. Where the governmental interest justifying a seizure is sufficiently compelling and the nature and extent of the intrusion occasioned by the seizure is not disproportionate to that interest, the seizure may be reasonable even though effected without a warrant. Brown v. Muhlenberg Township, 269 F.3d 205, 210 (3d Cir. 2001).[1]

---

[1] While the Fourth Amendment does not require officers to use the least intrusive or even less intrusive alternatives in search and seizure cases, Plakas v. Drinski, 19 F.3d 1143, 1149 (7th Cir. 1994), it does require officers' actions to be within the range of objectively reasonable conduct, Schulz v. Long, 44 F.3d 643, 649 (8th Cir. 1995). If a

The government has an interest in allowing its officers to protect themselves from animal attacks while they are engaged in their legitimate duties. The Court must balance the government's interest against the interest of the Hatches, homeowners who, having done nothing to invite government scrutiny, suddenly found their dog shot in their yard on a Saturday morning. The Hatches have a clear interest in ensuring that their pets and other effects are secure within their close.

The balance of these interests depends on whether an objectively reasonable officer in the position of Deputy Grosinger could conclude that the Hatches' dog posed an imminent threat. See Schulz, 44 F.3d at 648 (in determining reasonableness, courts must examine the facts as known to the officer at the moment he effectuates the seizure). Were a reasonable officer in the position of Deputy Grosinger to conclude that the dog posed an imminent threat, the balance of interests tips away from the right of the Hatches to be secure their effects, and toward the officer and his right to defend his own personal safety. In the words of the Third Circuit,

> [T]he state's interest in protecting life and property may be implicated when there is reason to believe the pet poses an imminent danger. . . . [T]he state's interest may even justify the extreme intrusion occasioned by the destruction of the pet in the owner's presence. This does not mean, however, that the state may, consistent with the Fourth Amendment, destroy a pet when it poses no immediate danger and the owner is looking on, obviously desirous of retaining custody.

Brown, 269 F.3d at 210-11.

---

seizure is disproportionately intrusive to the interest it serves, it is outside the range of objectively reasonable conduct under the Fourth Amendment. Brown, 269 F.3d 205.

Viewing the facts in a light most favorable to the Hatches, the Court concludes that a reasonable officer could well have concluded that their dog posed an imminent threat. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 395 (1989).

Here, the undisputed facts indicate that the dog, without restraint or owners in sight, made an aggressive charge which all three deputies in the yard regarded as an immediate threat to their personal safety. Deputy Urbiha backed up to the gate, Deputy Lassegard moved behind a chair, and Deputy Grosinger fired his weapon. While one could question Deputy Grosinger's choice to use the maximum level of force several seconds after Gwennie appeared, "the Fourth Amendment does not allow this type of 'Monday morning quarterback' approach because it only requires that the seizure fall within a range of objective reasonableness." Schulz, 44 F.3d at 649. Given the importance of the government's interest in assuring that its officers be allowed to protect themselves, the split-second decision-making required, and Gwennie's threatening behavior at the moment she was shot, the seizure was not so disproportionate to the interest at stake as to remove it from the realm of objectively reasonable conduct. Accordingly, the Court concludes that the seizure was reasonable. The Court therefore

need not determine whether the right was clearly established, see Saucier, 533 U.S. at 200, and Deputy Grosinger is entitled to qualified immunity.

**B. Failure to Train**

Defendants have also moved for summary judgment on the Hatches' claim that Sheriff Fletcher and Ramsey County failed to properly train and supervise Deputy Grosinger. A municipality may be held liable for deficient policies regarding the training of police officers where (1) the municipality's training practices are inadequate, (2) the municipality was deliberately indifferent to the rights of others in adopting them, and (3) an alleged deficiency in the city's hiring or training procedures actually caused the plaintiff's injury. Andrews v. Fowler, 98 F.3d 1069, 1076 (8th Cir. 1996). To prevail, a plaintiff must show that "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent." City of Canton v. Harris, 489 U.S. 378, 390 (1989).

Where the plaintiff has failed to demonstrate a constitutional violation, a municipality cannot be held liable for a failure to train. Abbott v. City of Crocker, Mo., 30 F.3d 994, 999 (8th Cir. 1994) ("The City cannot be liable in connection with . . . a failure to train theory . . . unless [the officer] is found liable on the underlying substantive claim."); Reynolds v. City of Little Rock, 893 F.2d 1004, 1007 (8th Cir. 1990) ("Where

there is no underlying constitutional violation, the presence or absence of policies which permit the use of excessive force [] is quite beside the point.") (internal quotation omitted). Because the Court has concluded that Officer Grosinger's shooting of the Hatches' dog was not an unreasonable seizure, the Court will enter summary judgment on the failure to train charge.

### C. Official Immunity

Defendants also move for summary judgment on Plaintiffs' state law claim on the grounds of official immunity and official vicarious immunity. Under Minnesota law, "a public official charged by law with duties which call for the exercise of judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." Elwood v. Rice County, 423 N.W.2d 671, 677 (Minn. 1988) (quoting Susla v. State, 247 N.W.2d 907 (Minn. 1976)). Official immunity "protects public officials from the fear of personal liability that might deter independent action and impair the effective performance of their duties." Id. at 678. An official is not entitled to official immunity when he or she acted with malice. Pletan v. Gaines, 494 N.W.2d 38, 42 (Minn. 1992).

A police officer who performs his or her duty to prevent crime and enforce the law is not generally acting in a ministerial capacity, but is usually exercising discretion. Elwood, 423 N.W.2d at 678. Generally, police officers acting in emergency situations are

required to exercise a significant amount of independent judgment; the law affords police officers this discretion so that they are not overly constrained in times of emergency:

> Official immunity is provided because the community cannot expect police officers to do their duty and then to second-guess them when they attempt to conscientiously do it. To expose police officers to civil liability whenever a third person might be injured would . . . tend to exchange prudent caution for timidity in the already difficult job.

Pletan, 494 N.W.2d at 41. Deputy Grosinger's response to the dog's advance— which required the sort of split-second decision-making that is the antithesis of a ministerial act—qualifies as discretionary.

Here, the record is bereft of any evidence of malice or bad faith that might strip Deputy Grosinger of his immunity for his discretionary act. See id. at 42; Elwood, 423 N.W.2d at 679. While the Hatches argue that "Deputy Grosinger killed Gwennie, not out of some perceived threat, but out of concern that not to shoot Gwennie would show fear of a barking dog and expose him to 'peer derision'" (Pls.' Mot. Opp. Sum. J. at 29), this is merely an attempt to read the facts of cases where official immunity was avoided onto the matter at hand, see Miskovitch v. Indep. Sch. Dist. 318, 226 F. Supp. 2d 990, 1017 n.11 (D. Minn. 2002), rather than a genuine effort to argue for legitimate factual inferences. There is no support for this theory in the record. Without colorable evidence of malice, Deputy Grosinger is entitled to official immunity on the Hatches' state law claim.

## Conclusion:

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 41) is **GRANTED**. The Complaint (Doc. 1) is hereby **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March 3, 2003

RICHARD H. KYLE
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*